UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANTONIO DARNELL MAYS,

                Plaintiff,

v.                                                                   Case No. 21-CV-295

SUSAN PETERS, *et al.*,

                Defendants.

## DECISION AND ORDER

Plaintiff Antonio Darnell Mays, who is representing himself and confined at Green Bay Correctional Institution, brings this lawsuit under 42 U.S.C. § 1983. Mason was allowed to proceed on claims under the Eighth Amendment for deliberate indifference to his medical needs against defendants Susan Peters and Lori-Jean Mettetal for allegedly failing to treat his back and stomach pain. The parties filed cross motions for summary judgment. (ECF Nos. 25, 30, 38.) All parties have consented to the full jurisdiction of a magistrate judge. (ECF Nos.11, 14, 16.)

### PRELIMINARY MATTERS

The defendants in their reply briefs argue that Mays failed to follow Fed. R. Civ. Pro. 56 and Civil L.R. 56; as such, the court should deem their facts admitted for purposes of summary judgment. (ECF Nos. 46, 47.) However, district courts are entitled to construe *pro se* submissions leniently and may overlook the plaintiff's noncompliance by construing the limited evidence in the light most favorable to the

plaintiff. *See Grady v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). While Mays's response materials do not formally conform with the rules, he submitted sworn declarations. As such, the court will consider the information contained in Mays's submissions where appropriate in deciding defendants' motions. The court notes that Mays filed his responses to both defendants' motions in one large document, so any confusion in the citation to Mays's response materials is a function of how Mays filed his responses.

## FACTS

*Parties*

At all times relevant hereto Mays was incarcerated at Green Bay Correctional Institution (GBCI). (ECF No. 32, ¶ 1.) From September 1, 2016, through December 23, 2020, defendant Advanced Practice Nurse Provider (APNP) Susan Peters worked at GBCI as an Advanced Care Provider (ACP). (ECF No. 42, ¶¶ 5-7.) At GBCI, both doctors and APNPs were classified as ACPs because they provided care for ailments that needed medical attention beyond what a nurse could provide. (*Id.*) Peters was a contract employee of Maxim Healthcare Services, Inc. and assigned to GBCI. (*Id.*, ¶¶ 5-6.) Her contract was renewed on a month-to-month basis, but in December 2020 she decided not to renew her contract in order to take a position elsewhere. (*Id.*, ¶¶ 7, 18.)

From September 3, 2019, to the present defendant Lori-Jean Mettetal[1] was employed as an APNP by the Wisconsin Department of Corrections and worked at

---

[1] Lori-Jean Mettetal's last name is now Wachholz. (ECF NO. 32, ¶ 2 n.1.)

2

Case 2:21-cv-00295-WED    Filed 10/11/22    Page 2 of 15    Document 48

GBCI. (ECF No. 32, ¶ 2.) Mettetal replaced Peters as an ACP at GBCI after Peters departed. (ECF No. 42, ¶ 17.)

*Peters's Treatment of Mays*

The facts as set forth by the defendants are mostly undisputed. Prior to 2019 Mays was diagnosed with chronic health issues that caused stomach and back pain, including diverticulitis and lower back issues. (ECF No. 32, ¶¶ 12, 27; ECF No. 42, ¶ 35.) At some point before 2019 unnamed medical providers established a care plan to treat his chronic pain, which included using a TENS unit and taking acetaminophen. (ECF No. 42, ¶¶ 36, 39.) Between May 22, 2019, and March 23, 2020, Peters examined Mays on three occasions for complaints unrelated to stomach or back pain. (*Id.*, ¶ 37.) On May 22, 2019, Peters treated Mays for chronic headaches; on February 11, 2020, Peters treated Mays for hypertension; and on March 23, 2020, Peters treated Mays for his Achilles tendon. (*Id.*)

On May 28, 2020, non-defendant Nurse Ashley examined Mays because he was complaining of abdominal cramping and pain. (ECF No. 32, ¶ 4.) According to Nurse Ashley, Mays was not in acute distress, so Nurse Ashley advised him to drink fluids and report any worsening symptoms. (*Id.*) On July 14, 2020, non-defendant Nurse Garland examined Mays because he was complaining about worsening lower back pain. (*Id.*, ¶ 5.) Mays told Nurse Garland that the TENS unit and the acetaminophen were providing little relief. (*Id.*) Nurse Garland scheduled Mays to see an ACP for further evaluation. (*Id.*)

3

As a result of Nurse Garland's request, Peters examined Mays on July 23, 2020. (ECF No. 42, ¶ 39.) In addition to having Mays continue with the acetaminophen and the TENS unit, Peters also gave him a TheraBand to recondition his back. (ECF No. 32, ¶ 6.) She also told Mays to schedule follow up appointments as needed. (ECF No. 42, ¶ 39.) A little over two weeks later, on August 10, 2020, Peters again examined Mays for complaints of lower back pain. (*Id.*, ¶ 40.) At that appointment Peters recommended that Mays request assignment to a lower bunk to help alleviate his day-to-day pain. (*Id.*)

On September 15, 2020, Mays submitted a health services request (HSR) asking to be seen for his lower back pain. (ECF No. 42, ¶ 41.) The next day non-defendant Nurse Brauer responded to Mays's HSR, telling him that he was added to the sick call list to visit with a nurse. (*Id.*, ¶ 41.) Five days later, on September 21, 2020, Mays submitted another HSR requesting to be seen for lower back pain. Nurse Brauer responded the next day, again telling Mays that he was scheduled for a sick visit. (*Id.*, ¶ 42.) The next day, on September 22, 2020, non-defendant Nurse Luebke examined Mays. (*Id.*, ¶ 43.) During that examination Mays told Luebke that he had surgery on his stomach in 2018 and developed a hernia as a result. (*Id.*) He also told her he believed his back pain was the result of "deteriorated discs" in his back. (*Id.*) Luebke directed Mays to continue taking his pain medication and scheduled him to see an ACP. (*Id.*)

The next day, September 23, 2020, Peters examined Mays for the complaints he discussed with Nurse Luebke. (ECF No. 42, ¶ 44.) After that examination, Peters

4

submitted a request to the Health Services Unit (HSU) referral department to have Mays referred to an outside medical provider for a CT scan. (*Id.*, ¶ 44.)

On October 8, 2020, Nurse Ashley examined Mays for complaints of stomach and back pain. (ECF No. 42, ¶ 45.) At that appointment Nurse Ashley told Mays that his CT scan was on hold due to delays caused by the COVID-19 pandemic. (*Id.*) On November 10, 2020, Peters examined Mays and reviewed with him his plan of care. (*Id.*, ¶ 46.) During the review Peters noted Mays's history with "lumbar spine disc abnormality" and acknowledged that that diagnosis had not been recently reviewed. (*Id.*) Peters also noted that Mays reported that alternating between naproxen and acetaminophen had been providing some relief of his lower back pain. (*Id.*) Peters reported that further recommendations to relieve Mays's back pain would be discussed after he had his CT scan. (*Id.*)

A little over two weeks later, on November 27, 2020, Mays had a CT scan at St. Vincent Hospital in Green Bay, Wisconsin. (ECF No. 42, ¶ 48.) A few days later, on December 2, 2020, Peters reviewed Mays's CT scan results and noted that the scan showed mild degenerative changes in his spine. (*Id.*, ¶¶ 48-49.) Peters and the rest of GBCI's HSU staff were already aware that Mays was suffering from mild degenerative issues in his spine, and his most recent care plan was tailored to address those issues. (*Id.*, ¶ 48.) Because Mays was scheduled to see an ACP in January, and because the results did not show any new condition or urgent medical need, Peters decided to wait to discuss the CT scan results with Mays at his January appointment. (*Id.*, ¶ 49.)

5

The next day, on December 3, 2020, Mays submitted an HSR requesting the results of his CT scan. (ECF No. 42, ¶ 50.) Non-defendant Nurse Henning responded the next day, telling Mays that his CT scan results would be discussed at his January appointment with an ACP. (*Id.*) On December 20, 2020, Mays submitted another HSR, again requesting the results of his CT scan. (*Id.*, ¶ 51.) Non-defendant Nurse Bost responded the next day, telling him that the results would be discussed with him at his appointment with an ACP in January. (*Id.*)

On December 23, 2020, Mettetal replaced Peters, who was no longer employed at GBCI. (ECF No. 42, ¶ 52.)

*Mettetal's Treatment of Mays*

At Mettetal's first examination of Mays on January 14, 2021, they discussed his CT scan results and his stomach pain. (ECF No. 32, ¶ 25.) Mettetal told Mays that the CT scan showed he had multiple stomach hernias, diastasis of the rectus abdominus muscles, and fluid in the region of his colon that previously underwent resection. (*Id.*) Mettetal also told Mays that the scan showed indications of possible fatty liver disease. (*Id.*, ¶ 26) Mettetal determined that none of these issues required immediate medical attention and referred Mays for a consultation with a gastroenterologist (GI) specialist to address what the CT scan showed. (*Id.*, ¶ 27.) Mettetal also ordered a Fibroscan to determine whether Mays had fatty liver disease and noted that, depending on the Fibroscan results, Mays may need to be referred to a hepatology specialist to assess his liver health. (*Id.*, ¶¶ 28-30.) Mettetal asserts that, during this period, because of the ongoing COVID-19 pandemic, appointments with outside

6

specialists commonly took several months to schedule, and Mettetal was not responsible for scheduling appointments. (*Id.*, ¶¶ 17, 32.)

Mettetal examined Mays again on January 25, 2021, to fit him for custom foot orthotics. (ECF No. 35-2 at 28-29.) A few weeks later, on March 8, 2021, she examined Mays because of continued complaints of back and abdominal pain. (ECF No. 32, ¶ 34.) During that exam Mettetal "thoroughly reviewed Mays's relevant medical history, took a personal history, and performed a physical exam." (*Id.*) Noting that, despite completing physical therapy, Mays's back pain persisted, Mettetal requested that HSU staff obtain a copy of the MRI Mays underwent in 2016 to help with diagnostics. (*Id.*) She also placed an order for Mays to consult with pain services once his MRI was reviewed. (*Id.*) Additionally, Mettetal learned that Mays had yet to have his Fibroscan or GI consult, so she directed non-defendant Nurse Kilmer (f/k/a Nurse Brauer) to get those scheduled "ASAP." (*Id.*, ¶ 35.) Nurse Kilmer worked with HSU scheduler A. Mapes to make sure the appointments were scheduled. (*Id.*)

On June 7, 2021, Mays received his Fibroscan. (ECF No. 35-2 at 64.) Because the results were normal and did not indicate fatty liver disease, Mettetal did not refer Mays to hepatology. (ECF No. 32, ¶ 36.) On July 16, 2021, Mays's care transitioned to non-defendant APNP Trzebiatowski and Mettetal was no longer was responsible for Mays's care. (*Id.*, ¶ 37.)

Mays had another CT scan on July 27, 2021, the results of which indicated that the findings from the original CT scan remained unchanged except that the fluid collection in the colon appeared to have resolved. (*Id.*, ¶ 39.)

*Mays's Allegations*

Mays largely does not contest the defendants' version of the facts. (ECF No. 45 at 7-15; 20-24.) At most he asserts generally that the defendants did nothing for his pain for several months, although he gives few details. The only specific example Mays gives is that, on July 23, 2020, although he told Peters that the acetaminophen and TENS unit was not providing relief, she insisted he continue using them anyway. (*Id.* at 9, ¶ 6.) He also states that he kept "on writing and telling (HSU) APNP Peters, and HSU Nurses how the symptoms was [*sic*] worsening, were [*sic*] it hurts to stand up, sit down, or lay down for five minutes before I start to have real bad pains in my stomach and lower back pains." (*Id.* at 11, ¶ 11.) However, Mays does not include the dates and times of these complaints or indicate whether anyone followed up with him. He further asserts that neither defendant did anything for his "fatty liver," and that "no one ever check my liver." (*Id.*, ¶ 27; at 14, ¶ 29.) Additionally he states that "the defendants had my [CT] results for months before calling me over to talk about my results." (*Id.* at 5.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the

8

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Mays claims that the defendants violated his Eighth Amendment rights when they were deliberately indifferent to his stomach and back pain. A prison official violates the Eighth Amendment when she is deliberately indifferent "to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To state a cause of action, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth*

9

*v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). "A medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe v. Elyea,* 631 F.3d 843 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). For purposes of summary judgment, the defendants do not dispute that Mays suffered an objectively serious medical need.

Mays argues that the defendants were deliberately indifferent to his stomach and back pain because they failed to treat his pain, delayed telling him the results of his CT scan, and never addressed his "fatty liver disease." To establish that a prison official was deliberately indifferent, a plaintiff must show "that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original). A plaintiff "can establish deliberate indifference by showing that medical personnel persisted with a course of treatment they knew to be ineffective." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (discussing *Greeno*, 414 F.3d at 654-655). A plaintiff can also establish deliberate indifference when there is an "'inexplicable delay' in responding to an inmate's serious medical condition.'" *Id.* (citing *Petties*, 836 F.3d at 731.)

The evidence shows as a matter of law that the defendants did not "doggedly persis[t] in a course of treatment known to be ineffective." *Greeno*, 414 F.3d at 655. At every appointment Peters adjusted her treatment of Mays's pain. Peters first examined Mays for stomach and back pain on July 23, 2020. And while she did recommend that Mays continue with acetaminophen and the TENS unit, even though

10

Mays complained they were ineffective, she also added the use of a TheraBand. When Peters examined Mays again a few weeks later and he was still complaining of back and stomach pain, she recommended a lower bunk restriction. Peters then examined Mays a month after that and had Mays referred for a CT scan. While Mays was waiting for the CT scan, Peters did a thorough review of his care plan, during which Mays told her that alternating between naproxen and acetaminophen was providing some relief. Peters recommended holding off on making any changes to the care plan until Mays had the CT scan. Once Mays had the CT scan, it did not indicate that he had any emergent health issues, so Peters decided to wait until Mays's next scheduled appointment to discuss the results with him.

The fact that Peters's treatment failed to alleviate Mays's pain does not mean she ignored it or was deliberately indifferent to it. While the Eighth Amendment "creates an obligation to provide medical care to prisoners . . . [t]his does not mean prisoners are entitled to receive unqualified access to healthcare." *Gabb v. Wexford Health Sources Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) (citations omitted). A defendant "is free from liability if he "responded reasonably to the risk, even if the harm ultimately was not averted."" *Gayton*, 593 F.3d at 620 (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)). Peters responded reasonably to Mays's complaints of pain. No reasonable factfinder could conclude that Peters unreasonably persisted in the same course of treatment.

As to Mays's allegation that Peters unreasonably delayed telling him the results of his CT scan, Peters exercised reasonable professional judgment in waiting to

11

disclose the CT scan results until Mays's next scheduled appointment. The Seventh Circuit Court of Appeals has emphasized "the deference owed to the professional judgments of medical personnel." *Zaya v. Sood*, 836 F.3d 800, 805 (2016). "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Id.* Because of the COVID-19 pandemic, appointment times in the HSU were limited. Mays had an appointment scheduled a few weeks after his results were received. Because the results did not demonstrate any emergent issues, it was reasonable for Peters to wait for that appointment to discuss the results with Mays.

More importantly, Mays has not provided any evidence that the delay in learning of the results of the CT scan increased his pain or worsened his condition in some way, which is required to survive summary judgment on a deliberate indifference claim. *See Gabb*, 945 F.3d at 1033. (Requiring that a plaintiff "place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed" on an Eighth Amendment deliberate indifference claim. (emphasis in original)).

Mettetal also appropriately addressed Mays's complaints of pain. When Mettetal first examined Mays, she reviewed his CT scan results with him. She also referred Mays to a GI specialist and ordered a Fibroscan to address Mays's fatty liver disease. When she examined Mays again two months later, and he was still making the same complaints, she worked to obtain a copy of his 2016 MRI and referred Mays

12

to pain services. When she learned that Mays still had not had his GI consult or his Fibroscan, she ensured they were scheduled. No reasonable factfinder could conclude that Mettetal unreasonably persisted in the same course of treatment. Moreover, Mays has not produced any evidence that the delays in scheduling those appointments injured him or caused him harm.

As for Mays's contention that his fatty liver disease was never addressed, his medical records directly contradict this and show that he had a Fibroscan, the purpose of which was to determine whether he had liver issues, including fatty liver disease. The results of the Fibroscan showed normal liver function. Mays has produced no evidence that he even has fatty liver disease. As such, no reasonable factfinder could conclude that Mettetal failed to treat his fatty liver disease.

The undisputed evidence shows that neither Peters nor Mettetal were deliberately indifferent to Mays's stomach and back pain. They both tried several different treatments to alleviate Mays's pain. The failure to alleviate pain is not enough to succeed on an Eighth Amendment claim; a plaintiff must show that the defendants let him suffer from "serious but *avoidable* pain." *Gabb* 945 F.3d at 1034. Mays does not present any evidence that defendants' actions or inactions caused him avoidable pain. In fact, his medical records show that some of his conditions improved and the defendants' treatments provided some relief. Also, any delays Mays experienced were not the fault of Peters or Mettetal, and there is no evidence that the delays caused him injury. There is also no evidence that Mettetal failed to treat Mays's fatty liver disease or that Mays even has fatty liver disease. Thus, no reasonable

13

factfinder could conclude the defendants were deliberately indifferent to Mays's stomach and back pain.

## CONCLUSION

For the foregoing reasons, Mays's motion for summary judgment is denied and the defendants' motions for summary judgment are granted. The defendants also argued they were entitled to qualified immunity. Because the court grants summary judgment on the merits, it does not need to address the qualified immunity argument. The case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Mays's motion for summary judgment (ECF No. 25.) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motions for summary judgment (ECF Nos. 30, 38) are **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 11th day of October, 2022.

BY THE COURT

*William E. Duffin*

WILLIAM E. DUFFIN
United States Magistrate Judge